KEMNITZER, BARRON & KRIEG, LLP
KRISTIN KEMNITZER        Bar No. 278946
ADAM J. MCNEILE          Bar No. 280296
KATHERINE SASS           Bar No. 326185
1120 Mar West St., Ste C2
Tiburon, CA 94920
Telephone: (415) 632-1900
Facsimile: (415) 632-1901
adam@kbklegal.com
kristin@kbklegal.com
katie@kbklegal.com

HOUSING AND ECONOMIC RIGHTS ADVOCATES
JOSEPH JARAMILLO         Bar No. 178566
DANIEL ALPER             Bar No. 329804
P.O. Box 29435
Oakland, CA 94604-9435
Telephone: (510) 271-8443
Facsimile: (510) 868-4521
jjaramillo@heraca.org
dalper@heraca.org
Attorneys for Plaintiff SHIRLEY NEER

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHIRLEY NEER,<br><br>                    Plaintiff,<br><br>    vs.<br><br>GOODLEAP, LLC; SERVICE FINANCE COMPANY, LLC,<br><br>                    Defendants.<br>_____/ | **Case No. 4:24-cv-01351**<br><br>**COMPLAINT FOR:**<br><br>**I.   VIOLATIONS OF THE CONSUMERS LEGAL REMEDIES ACT (CIVIL CODE § 1750, *ET SEQ.*);**<br>**II.  VIOLATIONS OF THE ELDER ABUSE AND DEPENDENT ADULT CIVIL PROTECTION ACT (WELFARE & INSTITUTIONS CODE § 15610.07, *ET SEQ.*);**<br>**III. SLANDER OF TITLE;**<br>**IV.  VIOLATIONS OF THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT (CIVIL CODE § 1788, *ET SEQ.*);**<br>**V.   VIOLATIONS OF THE HOME SOLICITATION SALES ACT (CIVIL CODE § 1689.5, *ET SEQ.*); AND**<br>**VI.  VIOLATIONS OF THE UNFAIR COMPETITION LAW (BUSINESS & PROFESSIONS CODE § 17200, *ET SEQ.*)**<br><br>JURY TRIAL DEMANDED |

**INTRODUCTION**

1.      This case involves a scheme in which Defendants GOODLEAP, LLC ("GoodLeap") and SERVICE FINANCE COMPANY, LLC ("Service Finance") partner with unscrupulous door-to-door salespersons and contractors to target vulnerable consumers for the sale and onerous "financing" of home improvement work that never happens, is only partially completed, or happens in such a negligent or deficient manner that it is essentially valueless. Plaintiff is 80 years old and lives in a modest, approximately 1,000-square-foot home in Oakland that she purchased in 1998. Plaintiff subsists on combined Social Security and pension benefits totaling less than $2,900 per month.

2.      GoodLeap and Service Finance, though and in conjunction with their partner-contractor and sales agent ECOSTAR REMODELING & CONSTRUCTION ("Ecostar"), preyed on Plaintiff, misrepresenting terms of a home improvement project and multiple loans totaling more than $91,000 to finance purported repairs for paint work, roof repair, French drains, and "decorative concrete".[1] While Defendants through their agent pressured Plaintiff to sign a "waiver" of Plaintiff's right to cancellation pursuant to an emergency exception to the Home Solicitation Sales Act, Civ. Code § 1689.13, these purported repairs were anything but an emergency. It strains credulity that any of the purported work could ever be considered "emergency work" – particularly for "decorative concrete." Further, while some portion of roof repair was done, the remainder of the work was never commenced or completed.

3.      The sales agent told Plaintiff that she was merely receiving "quotes" for loans to pay for work to her home but was not going to be obligated on any loans until she agreed to them. The loans that Plaintiff did not understand and that Defendants claim Plaintiff is obligated on are not mere trifles – the GoodLeap Loan Agreement totals $67,913.61 over a 15-year period, and the Service Finance Loan Agreement totals $23,650.80 over a 10-year period.[2] Thus, Plaintiff would be 95 years old and would have paid $91,564.41 when the two outstanding loans theoretically

---

[1] Although included in the Service Finance "contract" it is unclear what "decorative concrete" is.
[2] A second Service Finance Loan Agreement totaled $67,500 over a 15-year period. Plaintiff is informed and believes that Service Finance cancelled this loan at some point before the other Service Finance loan was originated.

1   end – for services never fully performed.

2   4.      One may ask what is in it for GoodLeap and Service Finance to make loans that are never

3   agreed to for home improvement work that is never completed? The answer is simple – they take

4   an undisclosed "kickback" on every loan they fund. Further, GoodLeap then securitizes and sells

5   its loans to various financial institutions while continuing to "service" the loans, also taking a fee

6   for this.[3] GoodLeap therefore insulates itself from the risk of these bad loans – spreading the risk

7   from the loans out among multiple other downstream purchasers of the securitized loans. The

8   entire enterprise is eerily reminiscent of the mortgage-backed securities crisis of 2007-08.[4]

9   5.      To keep the flow of loans (and profits), GoodLeap and Service Finance authorize door-

10  to-door salespeople like those of Ecostar to sign consumers like Plaintiff up for decades-long

11  loans that provide almost no value to the consumer. GoodLeap and Service Finance give these

12  salespersons near carte blanche authority to enter customers' homes on Defendants' behalf, sign

13  up customers for GoodLeap and Service Finance loans, obtain credit information from the

14  customers, facilitate the completion of loan applications, and send out the loan documents to the

15  customers. However, after providing this authority to the salespersons, GoodLeap and Service

16  Finance systematically and purposefully fail to exercise oversight over these salespersons, rubber

17  stamping the loan applications that the salespersons initiate and ratifying even deceptively

18  procured loan agreements. Plaintiff, through no fault of her own, fell victim to this trap.

19  6.      Plaintiff brings this action for Slander of Title, and violations of the Consumers Legal

20  Remedies Act, Civ. Code § 1750, *et seq.* (the "CLRA"); the Elder Abuse And Dependent Adult

21  Civil Protection Act, Welfare & Institutions Code § 15610.07, *et seq.* ("EADACPA"); the

22  Rosenthal Fair Debt Collection Practices Act, Civ. Code § 1788, *et seq.* (the "Rosenthal Act");

23  the Home Solicitation Sales Act, Civ. Code § 1689.5, *et seq.* (the "HSSA"); the Unfair

24  Competition Law, Bus & Prof. Code § 17200, *et seq.* (the "UCL") and to obtain restitution,

25

26  [3] *See* https://www.managementstudyguide.com/goodleap-business-model.htm (last visited January 9, 2024), specifically regarding GoodLeap's business model.

27  [4] *See* Alana Samuels, *The Rooftop Solar Industry Could Be On the Verge of Collapse*, TIME, January 25, 2024, available at https://time.com/6565415/rooftop-solar-industry-collapse/ (last visited February 29, 2024) ("In some

28  ways, the current situation in the residential solar market is analogous to the subprime lending crisis that set off the Great Rescission, though on a smaller scale.")

1   actual, statutory, civil, treble, and punitive damages for the harm that they have suffered.

2   Plaintiff also seeks a public injunction against GoodLeap, to enjoin its unlawful, unfair, and

3   fraudulent conduct.

4   **PARTIES**

5   7.      Plaintiff is an individual over the age of 18 years. At all times relevant herein, Plaintiff

6   was, and currently is, a resident of the State of California, County of Alameda.

7   8.      Defendant GoodLeap is, and at all times relevant herein was, a California Limited

8   Liability Company with its principal place of business in California, that at all times relevant

9   herein was licensed to do business and was conducting business in California.

10   9.      Defendant Service Finance is, and at all times relevant herein was, a Florida Limited

11   Liability Company with its principal place of business in Florida, that at all times relevant herein

12   was licensed to do business and was conducting business in California.

13   **THE HOLDER RULE**

14   10.     All claims and defenses that Plaintiff has against Ecostar arising out of the transaction are

15   also valid against GoodLeap and Service Finance, because GoodLeap and Service Finance are

16   the holders of any alleged consumer credit contract. Given the violations of law alleged below,

17   and the Federal Trade Commission Holder in Due Course rule, 16 C.F.R. § 433, *et seq*., which

18   subjects the holder of a consumer credit contract to all claims and defenses of the consumer

19   against the seller, GoodLeap and Service Finance are subject to all claims and defenses Plaintiff

20   may have against Ecostar.

21   **AGENCY**

22   11.     Plaintiff is informed, believes, and thereon alleges that at all times mentioned herein,

23   each Defendant, whether actually or fictitiously named, was the principal, agent (actual or

24   ostensible), or employee of Service Finance. In acting as such principal or within the course and

25   scope of such employment or agency, each Defendant took some part in the acts and omissions

26   hereinafter set forth, by reason of which each Defendant is liable to Plaintiff for the relief prayed

27   for herein.

28   12.     Furthermore, Plaintiff is informed, believes and thereon alleges that at all times

1    mentioned herein Ecostar employees and/or representatives act as agents and at the direction of

2    GoodLeap and Service Finance as part of the GoodLeap Program and the Service Finance

3    Program described below. GoodLeap and Service Finance retained the right to control the

4    conduct of Ecostar, including by (1) requiring Ecostar sales agents to use specific software,

5    applications, and technology when engaging in transactions with consumers on GoodLeap's and

6    Service Finance's behalf; (2) controlling the GoodLeap and Service Finance products Service

7    Finance sales agents could offer, the terms and conditions of the products offered, the method of

8    presentation of the products offered, and the contractual documents that could be utilized;

9    (3) controlling the marketing and sales tactics of GoodLeap, Service Finance and its sales agents;

10   (4) retaining the right to discipline Goodleap and Service Finance sales agents for violations of

11   policies and procedures set by GoodLeap and Service Finance. At all times, GoodLeap and

12   Service Finance have ratified the conduct of Service Finance and its sales agents, including in the

13   instant case.

14                                **JURISDICTION AND VENUE**

15   13.    This Court has federal diversity jurisdiction over Plaintiff's claims under 28 U.S.C. §

16   1332(a) in that the matter in controversy exceeds $75,000 and is between citizens of different

17   states.

18   14.    Venue is proper in the Northern District because a substantial part of the events or

19   omissions giving rise to Plaintiff's claims occurred in this District. 28 U.S.C. § 1391(b)(2).

20                                **FACTUAL ALLEGATIONS**

21                         **GoodLeap and Service Finance's Partner Programs**

22   15.    The deceptive sales tactics of door-to-door salesmen and contractors are enabled,

23   facilitated, and ratified by the large financing companies like GoodLeap and Service Finance that

24   fund the projects. The industry is rife with scams due to the deputization of door-to-door

25   salespersons tasked with signing vulnerable consumers up for tremendously expensive, multi-

26   decade contracts and loans.[5]

27   _____

28   [5] *See, Vivint Solar Buyers Ink Deal in Predatory Sales Suit*, LAW360, Sept. 12, 2022,
     https://www.law360.com/articles/1529150/vivint-solar-buyers-ink-deal-in-predatory-sales-suit
     (last visited on October 19, 2022); Press Release, Better Business Bureau, *BBB Scam Alert:*

16.     GoodLeap claims it is the largest lender and/or loan broker in the consumer home improvement marketplace. As of January 27, 2021, GoodLeap controlled 41% of the solar panel lending market.[6] GoodLeap's business model relies on the deceptive practices of its partners to gain an advantage over its competitors. As of August 31, 2023, GoodLeap had funded over $24 billion of home improvement loans to 700,000 customers.[7]

---

*"Free solar panels" can cost you big time! How to spot a phony offer and find a trustworthy business* (September 22, 2023), available at https://www.bbb.org/article/scams/27595-bbb-scam-alert-free-solar-panels-can-cost-you-big-time-how-to-spot-a-phony-offer (last visited on September 28, 2023); Better Business Bureau Business Profile of Sunnova Energy Corporation, Current Alert of deceptive sales practices, available at https://www.bbb.org/us/tx/houston/profile/solar-energy-design/sunnova-energy-corporation-0915-90035524 (last visited September 28, 2023); Press Release, California Contractors State Licensing Board, *CSLB Warns Consumers to be Cautious of Misleading and Illegal Solar Advertisements* (April 17, 2023), available at https://www.cslb.ca.gov/Resources/PressReleases/2023/Illegal_Advertisements.pdf (last visited September 28, 2023); Better Business Bureau Business Profile of Solar Mosaic LLC, Current Alert of forced payments for solar services not received, available at https://www.bbb.org/us/ca/oakland/profile/financial-services/solar-mosaic-llc-1116-444414/complaints (last visited September 28, 2023); Randy Travis, *Georgia PSC 'getting lit up with complaints about home solar ripoffs*, Fox5 Atlanta, May 26, 2022, available at https://www.fox5atlanta.com/news/psc-getting-lit-up-with-complaints-about-home-solar-ripoffs (last visited September 28, 2023); Dale Yurong, *198 Fresno County residents cheated in solar power scam*, ABC30 Fresno, September 19, 2019, available at https://abc30.com/fresno-county-fersno-scam-solar-fraud/5554203/ (last visited September 28, 2023); *Vivint Solar Investors Sue Brass Over Predatory Sales Worries*, Law360, Mar. 10, 2020, https://www.law360.com/articles/1252108/vivint-solar-investors-sue-brass-over-predatory-sales-worries (last visited on October 19, 2022); Kurtis Ming, *California Establishes Fund for Victims of Solar Fraud*, CBS Sacramento, Jul. 25, 2022, available at https://www.cbsnews.com/sacramento/news/california-establishes-fund-for-victims-of-solar-fraud/ (last visited on October 19, 2022); *CFPB Takes Action Against Fintech Company GreenSky for Enabling Merchants to Secure Loans For Consumers Without Their Authorization*, Consumer Financial Protection Bureau, Jul. 12, 2021, https://www.consumerfinance.gov/about-us/newsroom/cfpb-takes-action-against-fintech-company-greensky-for-enabling-merchants-to-secure-loans-for-consumers-without-their-authorization/#:~:text=The%20CFPB%20issued%20a%20consent,to%20prevent%20future%20fraudulent%20loans (last visited October 19, 2022); Jeff Goldman, NJ.com, Oct. 24, 2019, *Vivint Solar Agrees to Pay $122k Fine Over Charges of Deceptive Door-to-Door Sales Practices*, https://www.nj.com/news/2019/10/vivint-solar-agrees-to-pay-122k-fine-over-charges-of-deceptive-door-to-door-sales-practices.html (last visited October 19, 2022); *Vivint, Inc. to pay $375,000 to Resolve Allegations of Deceptive Advertising and Sales Practices*, Feb. 12, 2015, Georgia Office of the Attorney General Consumer Protection Division, https://consumer.georgia.gov/press-releases/2015-02-12/vivint-inc-pay-375000-resolve-allegations-deceptive-advertising-and-sales (last visited on October 19, 2022).

[6] Ari Levi, CNBC, *Exec Who Quit Solar City Now Runs the Leading Lender for Solar Installations,* Jan. 27 2021 https://www.cnbc.com/2021/01/27/hayes-barnard-turns-loanpal-into-billion-dollar-lender-after-solarcity.html (last visited on January 17, 2023).

[7] Cision PR Newswire, *GoodLeap Announces Closing of $470 Million Securitization Bringing the Company's Total to 18*, August 31, 2023, https://www.prnewswire.com/news-releases/goodleap-announces-closing-of-470-million-securitization-bringing-the-companys-total-to-18-301915376.html (last visited November 2, 2023).

17.     GoodLeap administers a paperless lending platform that it says is "frictionless" and allows near-instant approval of multi-decade loans of tens of thousands of dollars. The focus of GoodLeap's business is arranging loans to finance home improvement projects for individual consumers.

18.     To expand its business, GoodLeap designed, implemented and oversees the "GoodLeap Program." GoodLeap entices contractors to join the GoodLeap Program by promising that by doing so they will increase sales by up to 30%.

19.     Under the GoodLeap Program the contractors become GoodLeap's "Partners" and the sales agents of these "Partners" are deputized to simultaneously sell customers home improvement projects and arrange financing for these projects through GoodLeap loans. The availability of financing allows the "Partner" contractors to close more transactions.

20.     Service Finance offers a similar "Partner" program in which it deputizes "Partners" to arrange home improvement projects and loans on its behalf. It advertises:

> Service Finance Company, LLC is a nationally licensed sales finance company and an approved FHA Title 1 Lender. We provide in excess of fifty financing solutions which include promotional and standard installment terms for home improvement contractors enrolled in the SFC Financing Program. Our program strives to provide our contractors with the flexibility they require to offer their customers the ability to finance their purchases such as: HVA, Windows, Doors, Siding, Sunrooms, Flooring, Water Treatment, Plumbing, Solar, Roofing, Insulation and many more.[8]

21.     GoodLeap and Service Finance vest the sales agents of its "Partners" with the authority to obtain nonpublic Personally Identifiable Information ("PII") from consumers, to submit loan applications on their behalf, and to obtain the consumers' credit reports. The "Partners" and their sales agents are GoodLeap and Service Finance's agents in originating loans.

22.     GoodLeap and Service Finance offer their "Partners" immediate, on-the-spot approval of the loan applications that they submit through an electronic, paperless process. This assures the "Partner" contractors that they can close transactions in minutes with the assurance that they will be promptly paid for every deal they close.

23.     GoodLeap and Service Finance retain a portion of every loan generated by the sales

---

[8] *See* https://www.svcfin.com/# (last visited March 1, 2024).

agents of their "Partners" without disclosing this fee to the consumer. Thus, GoodLeap and Service Finance on the one hand, and the "Partner" contractors on the other hand, financially benefit from every loan generated by the sales agents of the "Partners" in the GoodLeap and Service Finance Programs. GoodLeap and Service Finance are incentivized to keep "Partners" happy as they are GoodLeap and Service Finance's agents and joint venturers in the GoodLeap and Service Finance Programs and the source of GoodLeap and Service Finance's fees.

24.     The GoodLeap and Service Finance Programs enable and facilitate the exploitation of vulnerable consumers by unscrupulous home improvement contractors who become "Partners" in the GoodLeap and Service Finance Programs. There are no effective safeguards in either to protect consumers. As a result, consumers are placed in loans that they did not authorize, whose terms they had no opportunity to review, and that they do not understand. GoodLeap and Service Finance ratify the entire process from application to funding.

25.     GoodLeap and Service Finance's business models allow their "Partners" to profit by saddling consumers with tens of thousands of dollars in debt to which they never agreed for projects the "Partners" do not complete. The GoodLeap and Service Finance's paperless systems focus on speed, and financial incentives allow "Partners" to close sales transactions, lock customers into financing, receive immediate payment through the Programs, and leave projects uncompleted, even after the consumer receives their first invoice from GoodLeap or Service Finance.

26.     GoodLeap and Service Finance have elected to turn a blind eye to misconduct by their "Partners" and, despite deputizing them with significant authority to lock consumers into loans, exercise virtually no oversight over their activities, but ratify all of their conduct nonetheless. Instead, GoodLeap and Service Finance choose to rely upon warranties and representations in contracts with their "Partners" while ignoring consumer complaints.

27.     Ecostar participated in the GoodLeap and Service Finance Programs and has been one of GoodLeap and Service Finance's "Partners." It utilized a deceptive scheme to saddle Plaintiff with home improvement contracts and wildly overpriced loans to finance wildly overpriced home improvement projects that were never completed.

**GoodLeap, Service Finance and Their Salespeople Entrapped Plaintiff**

28.    Plaintiff has lived in her home since 1998. She lives alone and does not have family in the area. She lives modestly but has excellent credit and is extremely careful with her expenses.

29.    In or around August 2023, Plaintiff was planning on moving into a more senior-friendly home and wished to have work done on her property to sell it. She reached out to a few contractors for bids and requested that they come to her home to provide quotes. She called a contractor named Ecostar, and a woman named "Talli" told her that she would send someone to her house on September 5 to provide a quote. Plaintiff expected all the contractors whom she had contacted to come to her house on September 5.

30.    On September 5, 2023, a salesperson named Or Halberor showed up at Plaintiff's home to provide a quote for the work Plaintiff wished to have done. Specifically, Plaintiff was looking for a new roof, exterior paint, and a French drain. GoodLeap and Service Finance had vested Mr. Halberor with broad authority to enter consumers into home improvement contracts and loans on their behalf.

31.    Mr. Halberor told Plaintiff that he would provide a competitive quote for the work but that she should act fast to lock it in so the quote would not change. Since Plaintiff was only seeking quotes, she relied upon his representation that he was there to provide one. She was not planning on signing a contract that day, because she planned on interviewing other contractors.

32.    The salesperson handed Plaintiff a stack of carbon copy documents with Ecostar's logo on the top of the page. Relying on the representation that the salesperson was providing a quote for the work, she signed the documents. The salesperson told Plaintiff where to sign but did not explain the purpose of any of the documents to her.

33.    One of these documents is entitled "Home Improvement Contract" ("HIC"). This HIC states that the "entire agreement is contained herein." However, the salesperson then handwrote on the addendum that "company will provide printed scope of work for roof: re-deck up to 2,000 sq ft cool life shingles. Exterior paint: replace wood siding as needed included front porch and stairs. French drain: up to 60 ft and replace cement if needed up to 120 sq ft. ** tax, labor and material included. ** Not including permit fees." Thus, the HIC by definition could not be the

1    entire scope of work because it specifically states that the company *will* provide a scope of work

2    and it does *not* include permit fees. Again, Plaintiff believed this was a quote for the scope of

3    work, since she was planning on meeting with several contractors and had told Ecostar that she

4    was seeking quotes.

5    34.     Nevertheless, the salesman pressured her to sign what she believed to be a quote because

6    he told her she needed to lock in the rate. Feeling rushed to sign because the salesperson told her

7    that any offer would expire, and that he would provide the full scope of work later, she relied on

8    his representations and signed the HIC though she believed it to be just a quote.

9    35.     While presenting what Plaintiff was led to believe was a quote, the salesperson asked

10    Plaintiff when she was looking for work to begin. She said she wanted to trim her rose bushes

11    and fruit trees before having any work done, and that she wanted the work to start sometime

12    before the rainy season.

13    36.     Then the salesperson handed her a document entitled "Three Day Right to Cancel" but,

14    on the very next page was a document entitled "Waiver." The salesperson told her that she

15    needed to write "I allow ecostar [sic] to start ASAP." Plaintiff did not care whether the work

16    started immediately or not. In fact, she had told the salesperson that she needed time to finish her

17    gardening before the work was started. She wanted repairs done to her property, but there was no

18    immediate urgency. Plaintiff had told the salesperson she was getting quotes and relied upon his

19    representation that he was providing a quote to her. She only signed the "Waiver" because the

20    salesperson was rushing her through the documents and that is what he told her to do. Again, she

21    believed this was all for a quote that she would be able to compare to the other quotes she wished

22    to receive. Her plan was to sit down that evening and compare quotes from various contractors

23    whom she had called.

24    37.     Additionally, unbeknownst to Plaintiff at the time, the salesman had her sign a document

25    called "Completion Certificate." This document states "[t]his documents acknowledges your

26    satisfaction of the work perform [sic] by the Eco Star Remodeling Team. Please inspect all the

27    work and make sure [sic] satisfied before signing." *No work had been done to Plaintiff's*

28    *property on September 5, 2023 – she had only just met the salesperson.*

38.     At one point, the salesperson told Plaintiff she needed to find a friend or relative to witness the documents. She had no idea why this was necessary for a quote and told the salesperson that she had no friends or relatives around. The salesperson told her to go knock on her next-door neighbor's door. She did so, and the son of the neighbor was home. Plaintiff does not even know the son's name. The salesperson had the son sign a document. Plaintiff was not provided with a copy of this document, did not know its purpose, and does not know what it said.

39.     After rushing her through the paper Ecostar documents, the salesperson asked Plaintiff to provide her date of birth, social security number, and other PII.

40.     The salesperson then asked Plaintiff to go to her email on her phone to do a credit check. She was told to click in various places for what she was told was a credit check and a credit application. She was not told that she was signing a loan agreement, much less two. Instead, she thought it was part of being part of pre-approved for financing as part of the home improvement quote.

41.     Unbeknownst to Plaintiff, the salesperson, on behalf of both GoodLeap and Service Finance, induced her to sign two separate Loan Agreements. The GoodLeap Loan Agreement totaled $67,913.61 and the Service Finance Loan Agreement totaled $67,500.00. Based on the representations by the salesperson, she believed she was just getting preapproved, but not signing a loan.

42.     Thereafter, the salesman left Plaintiff's home. Immediately after the salesman left Plaintiff's home, Plaintiff began to worry about her interaction with him. She had felt rushed and pressured and did not understand what the salesman had been offering. She wanted to get other quotes for the work, and she planned on reviewing them that evening. When she sat down to review what she believed was the Ecostar quote, she was shocked when she saw the "waiver" document. She had relied upon the salesman to provide her with a quote that she believed she could either accept or not. At the very least, she believed she had the opportunity to cancel. She was terrified when she saw the "waiver." She felt like she had been tricked and deceived into giving up her right to cancel. She did not know what to do.

43.     She wanted to cancel the transaction, but she felt she could not do so because the

1    salesperson had forced her to sign the cancellation waiver. She believed she had no recourse

2    because he told her to sign it.

3    44.    She went into more of a panic when workers showed up unannounced at her home on

4    September 7, 2023 to begin work. Though she was still well-within her statutory cancellation

5    period pursuant to Civ. Code § 1689.7, she thought that since the salesperson had deceived her

6    into signing a "waiver" on what she believed to be a quote, that she could not turn the workers

7    away.

8    45.    After September 7, Plaintiff called Ecostar to ask for any and all documentation. She did

9    not understand what had happened. "Talli" thereafter came to her home with paperwork showing

10   both the GoodLeap loan for $67,913.61 and the $67,500.00. This was the first time Plaintiff had

11   heard of either GoodLeap or Service Finance.

12   46.    Thereafter, on or around September 18, 2023, the salesperson returned and had her sign a

13   *third* Loan Agreement, this one also with Service Finance for $23,650.80. Plaintiff did not

14   understand why he returned to her home. The salesperson told her that she needed to sign the

15   document so he could get paid. He took Plaintiff's phone, went into her email, pulled up the new

16   loan agreement, and told her to sign while he watched her. She was afraid not to sign it because

17   she did not know what would happen if she did not comply.

18   47.    GoodLeap and Service Finance then began removing monthly payments from her bank

19   account. In total, GoodLeap and Service Finance withdraw $576.50 per month from her account.

20   This is nearly 20% of her monthly fixed income.

21   48.    The Loan number for the second Service Finance loan is identical to the Loan number for

22   the first Service Finance loan, 4289297. The monthly Service Finance withdrawal in the amount

23   of $197.09 matches the second loan. On that basis, Plaintiff is informed and believes that the first

24   Service Finance loan was cancelled and replaced with the second Service Finance loan.

25   49.    Plaintiff, through counsel, then sent GoodLeap, Service Finance, and Ecostar letters

26   canceling any contracts in a letter dated January 30, 2024. To this day, despite Plaintiff lawfully

27   cancelling any and all alleged contracts, GoodLeap and Service Finance continue to insist the

28   Loan Agreements are still valid, and have failed and refused to remove a GoodLeap UCC-1

1   financing statement it placed on Plaintiff's property. HERA sent a letter to GoodLeap, Service

2   Finance, and Ecostar on Plaintiff's behalf on January 30, 2024 outlining the events described

3   above. GoodLeap and Service Finance have both failed and refused to take corrective action,

4   thereby ratifying the behavior of Ecostar as Defendants' agent.

5   50.     Although Plaintiff has previously canceled any alleged contracts, this complaint shall

6   constitute separate notice of the unlawful acts and the request for cancellation pursuant to the

7   HSSA, Civil Code §§ 1689.7 and 1689(b)(1), and CLRA, Civil Code §§ 1770 and 1780.

8   51.     Plaintiff has faced emotional distress from Defendants' behavior and that of its partners.

9   Defendants' actions have had a severe negative effect on Plaintiff and have caused her to suffer

10  non-economic damages including emotional distress, stress, anxiety, and loss of enjoyment of

11  life. Specifically, she feels angry and upset, and like she's been "taken for a ride." Instead of

12  talking about happy topics with her friends, now she talks about how she feels like she was taken

13  advantage of and preyed on. She has ruminations and this ordeal plays in a loop in her head. She

14  has dreams to travel right now, but she cannot afford to do so. Additionally, she feels that she

15  cannot move into an elder-friendly living situation and is scared to list her house for sale due to

16  the GoodLeap UCC-1 financing statement.

17                                      **FIRST CLAIM**

18  **(Violations of the Consumers Legal Remedies Act, Civil Code § 1750, *et seq*.)**
    **(On Behalf of Plaintiff and the General Public Against all Defendants)**

19  52.     Plaintiff realleges and incorporates by reference as though fully set forth herein each and

20  every allegation contained in the preceding paragraphs.

21  53.     The CLRA was designed and enacted to protect consumers from unfair and deceptive

22  business practices. To this end, the CLRA sets forth a list of unfair and deceptive acts and

23  practices in Civil Code § 1770 that are prohibited in any transaction intended to result in the sale

24  or lease of goods or services to a consumer.

25  54.     At all relevant times, Plaintiff was a "consumer" within the meaning of the CLRA, Civil

26  Code § 1761(d). GoodLeap, Service Finance, and their agents are companies and, as such, are

27  "persons" as that term is defined in California Civil Code § 1761(c). The transactions from

28  which this action arises was intended to result in the sale or lease of goods or services to a

1  consumer and are covered by the CLRA.

2  55.     At all relevant times, Plaintiff was a senior citizen as that term is defined in Civil Code §

3  1761(f).

4  56.     The acts and practices of GoodLeap, Service Finance, and their agents violated the

5  CLRA and constitute the following unfair methods of competition and unfair or deceptive

6  practices:

7           a.  Making false or misleading statements of fact concerning reasons for, existence

8               of, or amounts of price reductions, in violation of Civil Code § 1770(a)(13);

9           b.  Representing that a transaction confers or involves rights and remedies which it

10              does not have or involve, or are prohibited by law in violation of Civil Code §

11              1770(a)(14);

12          c.  Representing that the subject of a transaction has been supplied in accordance

13              with a previous transaction when it has not, in violation of Civil Code §

14              1770(a)(16);

15          d.  Misrepresenting the authority of a salesperson, representative, or agent to

16              negotiate the final terms of a transaction with a consumer, in violation of Civil

17              Code § 1770(a)(18); and

18          e.  Inserting an unconscionable provision in a contract, in violation of Civil Code §

19              1770(a)(19).

20  57.     GoodLeap, Service Finance, and their agents' violations of the CLRA present a

21  continuing threat to Plaintiff and the public in that GoodLeap, Service Finance, and its agents

22  continue to engage in the above-referenced acts and practices.

23  58.     The acts and practices of GoodLeap, Service Finance, and their agents are willful,

24  intentional, and approved by managing agents as detailed above. The acts and practice have

25  harmed Plaintiff.

26  59.     This Complaint shall serve as further notice of the statutory violations described therein.

27  GoodLeap and Service Finance have failed and refused to make restitution or offer Plaintiff

28  adequate correction, repair, relief, or other remedy.

60.     Plaintiff is entitled to statutory damages pursuant to Civil Code § 1780(b) due to her status as a senior citizen.

61.     Additionally, GoodLeap and Service Finance's violations of Civil Code § 1770 present a continuing threat to members of the public in that GoodLeap and Service Finance continue to engage in the alleged practices and has not ceased.

62.     Plaintiff seeks statutory damages, actual damages, punitive damages, an injunction, and any other relief the court deems proper pursuant to Civil Code § 1780(a).

63.     Plaintiff is also entitled to an award of attorneys' fees and costs pursuant to Civil Code § 1780(d).

WHEREFORE, Plaintiff prays for relief as set forth below.

**<u>SECOND CLAIM</u>**
**(Violation of the Elder Abuse and Dependent Adult Civil Protection Act, Welfare & Institutions Code § 15600, *et seq*.)**
**(On Behalf of Plaintiff Against All Defendants)**

64.     Plaintiff realleges and incorporates by reference as though fully herein each and every allegation contained in the preceding paragraphs.

65.     The California Legislature declared that elders are a "disadvantaged class" vulnerable to predatory practices when it enacted the Elder Abuse Act, a state law enforcing the civil rights of the elderly and disabled." Welf. & Inst. Code § 15600. In enacting Elder Abuse Act, the Legislature recognized that elders may be subject to abuse and declared that the State "has a responsibility to protect them" from abuse, including financial abuse.

66.     The 2008 amendments to Elder Abuse Act created a conclusive presumption of financial abuse where a person or entity knew or should have known that their conduct was likely to be harmful to an elder. "A person or entity shall be deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder or dependent adult." Welf. & Inst. Code § 15610.30(b).

67.     Plaintiff at all times relevant to the events described herein, was an "elder" adult within the

1  meaning of Welfare & Institutions Code § 15610.27 because she is over the age of 65.

2  68.   At all times relevant herein, GoodLeap and Service Finance actually knew or should have

3  known based on their own observations that Plaintiff is an elder adult.

4  69.   The acts and omissions of GoodLeap and Service Finance as above alleged constitute

5  financial abuse of an elder adult within the purview and protections of the Welfare & Institutions

6  Code § 15610.07 in that they were the proximate cause of the financial abuse or other treatment

7  with resulting physical harm, and pain or mental suffering to Plaintiff. "Mental suffering" as

8  used herein means fear, agitation, confusion, severe depression, or other forms of serious

9  emotional distress that is brought about by forms of intimidating behavior, threats, harassment,

10  or by deceptive acts performed, or false and misleading statements made with malicious intent to

11  cause such mental conditions in an elder or dependent adult.

12  70.   GoodLeap and Service Finance took undue advantage of Plaintiff by misrepresenting and

13  concealing material facts.

14  71.   In doing the acts alleged herein GoodLeap and Service Finance took, secreted,

15  appropriated, or retained (or else assisted in so taking, secreting, appropriating, or retaining) the

16  property of Plaintiff to a wrongful use, or with the intent to defraud, or both, the property of

17  Plaintiff, thereby causing her to suffer financial abuse.

18  72.   GoodLeap and Service Finance are engaged in a pattern of financial elder abuse with a

19  conscious disregard for Plaintiff's rights, as well as recklessness, oppression, fraud, or malice in the

20  commission of this abuse as defined by Civil Code § 3294.

21  73.   As a direct and legal result of GoodLeap and Service Finance's violations of the Elder and

22  Dependent Adult Civil Protection Act in their dealings with Plaintiff, Plaintiff has suffered actual,

23  consequential and incidental damages, including without limitation, with respect to Plaintiff's

24  mental suffering and emotional distress. Plaintiff is also entitled to exemplary damages, particularly

25  because GoodLeap and Service Finance's predatory practices have been directed at especially

26  vulnerable and unsophisticated consumers.

27  74.   Plaintiff continues to suffer damages, the precise amount of which is unknown at the present

28  time; the limitations of Code of Civil Procedure § 377.34 do not apply here.

75.     In addition to all other remedies provided by law, pursuant to terms of Welfare & Institutions Code § 15675.5, Plaintiff is entitled to actual damages and general damages, and all other forms of relief otherwise allowed by law.

76.     Plaintiff is also entitled to treble damages under Civil Code § 3345 which is calculated as three times the amount that the trier of fact otherwise awards in damages against GoodLeap and Service Finance for their wrongful conduct.

77.     Pursuant to Welfare & Institutions Code § 15657.5, Plaintiff is entitled to an award for her reasonable attorneys' fees and costs.

WHEREFORE, Plaintiff prays for judgment as set forth below.

**THIRD CLAIM**
**(Slander of Title)**
**(On behalf Plaintiff against GoodLeap)**

78.     Plaintiff realleges and incorporates by reference as though fully set forth herein each and every allegation contained in the paragraphs above.

79.     GoodLeap has disparaged Plaintiff's valid title to her property by and through the continued recordation and publication of a UCC-1 Financing Statement and its refusal to remove said Statement after Plaintiff lawfully cancelled any and all alleged Loan Agreements arising from this transaction. GoodLeap was required to immediately remove UCC-1 Financing Statement no later than January 30, 2024 after Plaintiff lawfully cancelled any and all alleged Loan Agreements with GoodLeap.

80.     Plaintiff has no further obligation to GoodLeap or any other entity. Nevertheless, GoodLeap's continued recordation and publication of the UCC-1 Financing Statement concerning some undisclosed fixture allegedly affixed to Plaintiff's property cast doubt on the ownership of Plaintiff's property.

81.     GoodLeap has refused to remove said statement after Plaintiff lawfully cancelled any alleged Loan Agreement with GoodLeap despite GoodLeap knowing that the statement was and is false. GoodLeap also has acted and continues to act with conscious disregard of the truth or falsity of whether GoodLeap has an interest in any goods affixed to Plaintiff's property. GoodLeap has continued to maintain the Financing Statement on Plaintiff's property with the

1  malicious intent to injure Plaintiff, deprive her of her exclusive right, title, and interest in the

2  property, and obtain the property by use of unlawful means, including but not limited to

3  unlawfully attempting to collect monthly payments to which GoodLeap had no right.

4  82.    The UCC-1 Financing Statement is naturally and commonly interpreted as denying,

5  disparaging, and casting doubt upon encumbrances to Plaintiff's property and a fixture thereto.

6  By posting, publishing, and recording the UCC-1 Financing Statement, GoodLeap's

7  disparagement of Plaintiff's title was made to the world at large.

8  83.    As a direct and proximate result of GoodLeap's conduct, Plaintiff's title to her property

9  has been disparaged and slandered, and there is a cloud on Plaintiff's title. Plaintiff has suffered

10  and continues to suffer damages in an amount to be proven at trial. Specifically, Plaintiff wishes

11  to sell the property in 2024, but has delayed doing so in part because of the UCC-1 Financing

12  Statement that GoodLeap refuses to remove from the property despite Plaintiff's lawful

13  cancellation of any and all alleged contract and Loan Agreement.

14  84.    Furthermore, GoodLeap has forced Plaintiff to incur attorneys' fees, costs, and expenses

15  associated with attempting to clear her title and attempt to remove the UCC-1 Financing

16  Statement that GoodLeap unlawfully recorded on undefined goods attached to her property.

17  85.    GoodLeap's actions have had a severe negative effect on Plaintiff and have caused

18  Plaintiff to suffer emotional distress, nuisance, stress, and anxiety. Specifically, Plaintiff is

19  terrified that she will not be able to sell her home because of GoodLeap's slanderous cloud on

20  title.

21  86.    GoodLeap knew or should have recognized that potential buyers of the property will rely

22  on GoodLeap's UCC-1 Financing Statement to PLAINITFF's detriment.

23  87.    The conduct of GoodLeap in preparing, posting, publishing, and recording of the UCC-1

24  Financing Statement and its refusal to remove said Statement when Plaintiff lawfully cancelled

25  any alleged Loan Agreement are fraudulent, malicious, and oppressive. Plaintiff is entitled to an

26  award of punitive damages.

27        WHEREFORE, Plaintiff prays for relief as set forth below.

28  //

**FOURTH CLAIM**
**(Violations of the Rosenthal Fair Debt Collection Practices Act, Civil Code § 1788, *et seq.*)**
**(On behalf of Plaintiff against all Defendants)**

88.     Plaintiff realleges and incorporates herein by reference as though fully set forth herein each and every allegation contained in the preceding paragraphs.

89.     The Legislature enacted the Rosenthal Act in 1976 to ensure the integrity of our banking and credit industry. Civil Code § 1788.1(b). The Legislature found that "unfair or deceptive debt collection practices undermine the public confidence which is essential to the continued functioning of the banking and credit system and sound extensions of credit to consumers." Civil Code § 1788.1(a)(1).

90.     At all times relevant herein GoodLeap and Service Finance are "debt collectors" within the meaning of Civil Code § 1788.2(c). GoodLeap and Service Finance regularly and in the ordinary course of business, on behalf of themselves or others, engage in acts and practices in connection with the collection of consumer debt.

91.     The debts which GoodLeap and Service Finance are attempting to collect from Plaintiff are "consumer debts" within the meaning of Civil Code § 1788.2(f). Plaintiff is a "debtor" within the meaning of Civil Code § 1788.2(h) in that she is natural person from whom GoodLeap and Service Finance sought and continue to seek to collect consumer debts alleged to be due and owing.

92.     GoodLeap and Service Finance have a non-delegable duty under the Rosenthal Act not to commit violations of the Act, and not to allow its agents to commit such violations, which duty GoodLeap and Service Finance are prohibited from violating.

93.     Since September 2023, GoodLeap and Service Finance have attempted to collect non-existent debts from Plaintiff. GoodLeap and Service Finance have contacted Plaintiff by letter and phone, and collected amounts that are not owed as matter of law because Plaintiff never entered into any valid contract with GoodLeap or Service Finance, and furthermore lawfully rescinded any alleged contracts. Plaintiff does not owe any amount to GoodLeap or Service Finance.

94.     GoodLeap and Service Finance made false representations that Plaintiff owed monthly

1  payments to GoodLeap and Service Finance even though Plaintiff never had any obligation to

2  GoodLeap or Service Finance.

3  95.    GoodLeap and Service Finance have violated the Rosenthal Act. The violations include,

4  but are not limited to the following:

5      a.  GoodLeap and Service Finance made and used false, deceptive, and misleading

6          representations in an attempt to collect the account, in violation of California Civil Code

7          § 1788.17;[9]

8      b.  GoodLeap and Service Finance misrepresented the character, amount, or legal status of

9          the account, in violation of California Civil Code §§ 1788.13(e) and 1788.17;[10]

10     c.  GoodLeap and Service Finance misrepresented the compensation which may be lawfully

11         received by GoodLeap and Service Finance for the collection of the account, in violation

12         of California Civil Code §§ 1788.13(e), 1788.14(b), and 1788.17;[11]

13     d.  GoodLeap and Service Finance are attempting to collect the account from Plaintiff, an

14         action that cannot lawfully be taken, in violation of California Civil Code 1788.13(e) and

15         1788.17;[12]

16     e.  GoodLeap and Service Finance misrepresented that the account is lawfully owed by

17         Plaintiff, in violation of California Civil Code § 1788.17;[13]

18     f.  GoodLeap and Service Finance are attempting to collect interest, fees, or other charges

19         from Plaintiff that are not expressly authorized by the law agreement creating the account

20         or otherwise permitted by law, in violation of California Civil Code §§ 1788.13(e) and

21         1788.17;[14]

22  96.    Furthermore, GoodLeap and Service Finance violated Civ. Code § 1788.17, which

23  requires every debt collector collecting or attempting to collect a consumer debt to comply with

24  the provisions of 15 U.S.C. § 1692b to § 1692j of 15 U.S.C. § 1692.

25

26  [9] 15 U.S.C. §§ 1692e and 1692e(10).
    [10] 15 U.S.C. § 1692e(2)(A).
27  [11] 15 U.S.C. § 1692e(2)(B).
    [12] 15 U.S.C. § 1692e(2), 1692e(5) and 1692e(10).
28  [13] 15 U.S.C. § 1692e, 1692e(5), and 1692e(10).
    [14] 15 U.S.C. § 1692f(1).

97.    As a proximate result of GoodLeap and Service Finance's violations of the Rosenthal

Act, Plaintiff has suffered damages in amounts to be proven at trial.

98.    Plaintiff is entitled to recover her actual damages pursuant to Civil Code § 1788.17,

incorporating by reference 15 U.S.C. § 1692k(a)(1), or in the alternative, Civil Code §

1788.30(a), including, but not limited to, damages for his emotional distress.

99.    Plaintiff is also entitled to recover statutory damages pursuant to Civil Code § 1788.17,

which incorporates by reference the remedies of 15 U.S.C. §1692k(a)(2)(A), or in the alternative,

Civil Code § 1788.30(b).

100.    Plaintiff is entitled to attorneys' fees and costs pursuant to Civil Code § 1788.17,

incorporating by reference 15 U.S.C. § 1692k(a)(3), or in the alternative, Civil Code §

1788.30(c).

WHEREFORE, Plaintiff prays for relief as set forth below.

### FIFTH CLAIM
**(Violations of the Home Solicitation Sales Act, Civil Code § 1689.5, *et seq.*)**
**(On behalf of Plaintiff against all Defendants)**

101.    Plaintiff realleges and incorporates by reference as though fully set forth herein each and

every allegation contained in the preceding paragraphs.

102.    The Legislature enacted the HSSA in 1971 to protect California consumers against the

type of pressures that arise when a sales agent appears at a buyer's home. Regardless of whether

the buyer invites the seller to his/her home, serious pressure arises from the mere fact that the

seller may be an intimidating presence once inside the buyer's home. A reluctant buyer can

easily walk away from a seller's place of business, but he/she cannot walk away from his/her

own home and may find that the only practical way of getting the seller to leave is to agree to

buy what the seller is selling.

103.    As a result, the HSSA broadly defines "home solicitation" to mean "any contract,

whether single or multiple, or any offer which is subject to approval, for the sale, lease, or rental

of goods or services or both, made at other than appropriate trade premises in an amount of

twenty-five dollars ($25) or more, including any interest or service charges." Civil Code §

1689.5(a). The definition focuses not on who initiated the contact between the buyer and the

1    seller, but on where the contract was made.

2    104.    The term "services" is defined to mean "services furnished in connection with the repair,

3    restoration, alteration, or improvement of residential premises." Civ. Code § 1689.5(d). While

4    the HSSA excludes from its purview financial services offered by banks "that are not connected

5    with the sale of goods or services, as defined herein," it specifically does *not* exempt financial

6    services offered by banks that *are* connected with the sale of goods or services. Thus, both

7    GoodLeap's and Service Finance's loans associated with the Ecostar home improvement

8    contract are "services" as defined by the HSSA.

9    105.    Because of these pressures, the Home Solicitation Sales Act gives the non-senior citizen

10   consumer the right to cancel a home solicitation contract until midnight of the third business day

11   after the buyer receives a signed and dated copy of the contract or offer to purchase that complies

12   with Section 1689.7. Civil Code §1689.6(a)(2). This cancellation right is extended to five days

13   for seniors.

14   106.    Home solicitation sales contracts must be:

15        written in the same language, e.g. Spanish, as principally used in the oral sales
16        presentation, shall be dated, shall be signed by the buyer, and . . . shall contain in
          immediate proximity to the space reserved for the buyer's signature, a conspicuous
17        statement in the size equal to at least 10-point boldface type, as follows:

18        (B) For all buyers: "You, the buyer, may cancel this transaction at any time prior to
          midnight for the third business day after the date of the transaction. See the attached
19        notice of cancellation form for an explanation of this right.

20   Civil Code § 1689.7(a)(1); *see also* Civil Code § 1689.7(a)(4).

21   107.    The precise contents of the notice of cancellation are set forth in the HSSA and cannot be

22   modified.

23   108.    If a seller fails to strictly comply with these notice provisions, the buyer retains the right

24   to cancel the contract until the seller complies with the HSSA. Civil Code § 1689.7(c). The seller

25   is not entitled to any compensation. Civil Code §§ 1689.11.

26   109.    The three- or five-day cancellation requirements can only be waived in the most exacting

27   of circumstances that do not apply here. Civ. Code § 1689.13. The contract must be executed "in

28   connection with making of emergency or immediately necessary repairs that are necessary for

1   the immediate protection of persons or real or personal property." Civ. Code § 1689.13(b). In

2   addition, the buyer must "describe the situation that requires immediate remedy." Civ. Code §

3   1689.13(c). These circumstances were not present in the instant case.

4   110.    The Ecostar contract that GoodLeap and Service Finance seek to enforce against Plaintiff

5   was purportedly entered into at Plaintiff's home, was not entered into at an "appropriate trade

6   premise," is contract for "goods" and/or "services" and is regulated by and subject to the HSSA.

7   111.    Furthermore, Plaintiff was not provided orally with her notice of the right to cancel any

8   contract or loan agreement, as required by Civ. Code § 1689.7(f).

9   112.    In connection with the alleged GoodLeap loan agreement, GoodLeap failed to provide

10   California consumers, including Plaintiff, with an agreement complying with Civil Code §

11   1689.7 or the requisite Notice of Cancellation form in duplicate. Section 17 of the GoodLeap

12   loan agreement states "YOU THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY

13   TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF

14   THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELATION FORM FOR

15   AN EXPLANATION OF THIS RIGHT." But, in violation of Civ. Code § 1689.7(a)(1)(B), there

16   is no place for the consumer to sign.

17   113.    GoodLeap's purported incorporation by reference does not comply with the requirements

18   of Civil Code § 1689.7. Nor does GoodLeap include the form Notice of Cancellation in duplicate

19   required by the Act, in violation of Civil Code § 1689.7(c)(1).

20   114.    The Service Finance alleged loan agreements contain a one-page document that

21   references "NOTICE OF RIGHT OF RESCISSION (FOR REFINANCING BY A DIFFERENT

22   LENDER OR ORIGINATION OF A NEW RESCINDABLE LOAN)." But, this document does

23   not come close to complying with Civ. Code § 1689.7, containing none of the requisite language.

24   115.    Finally, neither GoodLeap nor Service Finance's loan agreements gave Plaintiff, a senior,

25   a five day right to cancel.

26   116.    Plaintiff exercised her statutory right to cancel any and all contract(s) Defendants

27   contends Plaintiff entered into and hereby further informs Defendants of her cancellation of any

28   such contract(s).

117.   If the buyer cancels, the seller must return anything the buyer paid within ten (10) days of the notice of cancellation.

118.   The buyer must make the goods available to the contractor for twenty (20) days from the date of cancellation. If the seller fails to retrieve the goods, the buyer may keep the goods without further obligation.

119.   Defendants and Ecostar denied Plaintiff her statutory right to cancel after her lawful cancellations.

120.   Defendants violated Civil Code § 1689.5, *et seq.* by failing to provide Plaintiff with statutorily compliant notice of her statutory right to cancel, and by failing to return the amounts collected from Plaintiff within ten (10) days of the date she exercised her statutory right to cancel any contracts Defendants or their agents contend Plaintiff entered into.

121.   An actual controversy exists between Plaintiff, on the one hand, and GoodLeap and Service Finance, on the other hand, concerning the parties' rights and duties under the HSSA. This controversy is ripe for adjudication. Plaintiff is entitled to a declaratory judgment adjudicating the rights and duties of the parties under the HSSA.

122.   Plaintiff is entitled to actual or nominal damages pursuant to Civil Code §3360 for Defendants' violations.

WHEREFORE, Plaintiff prays for relief as set forth below.

**SIXTH CLAIM**
**(Violations of Business and Professions Code § 17200, *et seq.*)**
**(On behalf of Plaintiff against all Defendants)**

123.   Plaintiff realleges and incorporates by reference as though fully set forth herein each and every allegation contained in the paragraphs above.

124.   Plaintiff has standing to bring this claim because she has lost money or property as a result of the acts and practices alleged herein.

125.   The UCL defines unfair competition to include any unlawful, unfair, or fraudulent business act or practice, and prohibits such conduct. Beginning on an exact date unknown to Plaintiff, but at all times relevant herein, GoodLeap and Service Finance and their agents committed and are continuing to commit acts of unfair competition proscribed by the UCL,

1    including the practices alleged herein.

2    126.    The business acts of GoodLeap and Service Finance, as hereinabove alleged, constitute

3    unlawful business practices.

4    127.    The business acts of GoodLeap and Service Finance, as hereinabove alleged also

5    constitute unlawful practices under federal law in at least four respects:

6            a)    GoodLeap and Service Finance have violated Federal Trade Commission Holder

7                Rule, 16 C.F.R. § 433, *et seq.* by failing to comply with the Holder Rule,

8                including by refusing liability and instructing Plaintiff that she had to deal with

9                Ecostar to remedy any and all problems instead of GoodLeap and Service

10                Finance, and/or refusing to offer an appropriate remedy pursuant to Defendants'

11                liability under the Holder Rule; and

12            b)    GoodLeap and Service Finance have violated Financial Code § 22161(a) by

13                engaging in dishonest dealings, among other things.

14    128.    The business acts and practices of GoodLeap and Service Finance, as hereinabove

15    alleged, constitute unfair business practices in that the acts and practices offend public policy and

16    are substantially injurious to consumers. The acts and practices have no utility that outweigh the

17    substantial harm to consumers.

18    129.    The business acts and practices of GoodLeap and Service Finance as hereinabove

19    alleged, constitute fraudulent business practices in that the acts and practices are likely to deceive

20    the public and affected consumers as to their legal rights and obligations and avoid mandated

21    disclosures; and by use of such deception, induce consumers to enter transactions which they

22    otherwise would decline. The practices alleged are fraudulent and unfair, constituting deceptive

23    practices which were predatory under the circumstances set forth herein.

24    130.    The unlawful, unfair, and fraudulent business acts and practices described herein present

25    a continuing threat in that GoodLeap, Service Finance, and their agents are currently engaging in

26    such acts and practices and will persist and continue to do so unless and until an injunction is

27    issued by the Court.

28    131.    Pursuant to Business and Professions Code § 17203, Plaintiff seeks a public injunction

for the unlawful, unfair, and fraudulent engaged in by GoodLeap, Service Finance, and their agents.

132.    Plaintiff is entitled to restitution of all amounts taken by GoodLeap, Service Finance, and their agents.

133.    Plaintiff is entitled to an award of attorneys' fees and costs in prosecuting this action under Code of Civil Procedure § 1021.5 because:

    a)    A successful outcome in this action will result in the enforcement of important rights affecting the public interest by protecting the general public from unfair, unlawful, and deceptive practices.

    b)    This action will result in a significant public benefit by compelling GoodLeap and Service Finance to comply with the law.

    c)    Unless this action is prosecuted, GoodLeap and Service Finance's activities will go unremedied and will continue unabated.

    d)    Plaintiff is an individual of modest means with limited access to the courts and the civil justice system. Unless attorneys' fees, costs and expenses are awarded against GoodLeap and Service Finance, Plaintiff will not recover the full measure of their loss.

WHEREFORE, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(1)    An award of actual damages, including but not limited to, emotional distress damages;

(2)    An award of general damages;

(3)    An award of punitive damages;

(4)    An award of statutory damages;

(5)    An award of nominal damages;

(6)    An award of civil penalties;

(7)    An award of restitution;

(8)    An award of treble damages;

(9)     An order finding and declaring that any alleged contracts between Plaintiff, GoodLeap, Service Finance, and its agents, including Ecostar, have been cancelled and are void;

(10)     An order finding and declaring that any work performed to Plaintiff's home is the property of Plaintiff without obligation to pay for it;

(11)     An order finding and declaring that GoodLeap and Service Finance's acts and practices challenged herein are unlawful, unfair, and fraudulent;

(12)     A comprehensive public injunction barring GoodLeap and Service Finance from engaging in the unlawful, unfair, and fraudulent business practices challenged herein and compelling GoodLeap and Service Finance to conform their conduct to the requirements of the law;

(13)     Prejudgment interest at the maximum legal rate;

(14)     An award of attorneys' fees, costs, and expenses incurred in the investigation, filing, and prosecution of this action; and

(15)     Any other and further relief as this Court shall deem just and proper.

Dated: March 6, 2024                          KEMNITZER, BARRON & KRIEG, LLP

                                              HOUSING AND ECONOMIC RIGHTS
                                              ADVOCATES

                                    By:     _/s/ Kristin Kemnitzer_____
                                              KRISTIN KEMNITZER
                                              ADAM J. MCNEILE
                                              JOSEPH JARAMILLO
                                              DANIEL ALPER
                                              Attorneys for Plaintiff Shirley Neer

1

## **JURY TRIAL DEMANDED**

2

Plaintiff demands a trial by jury on all issues so triable.

3

Dated: March 6, 2024                                KEMNITZER, BARRON & KRIEG, LLP

4

HOUSING AND ECONOMIC RIGHTS
ADVOCATES

5

6

By:     /s/ *Kristin Kemnitzer*

7

KRISTIN KEMNITZER
ADAM J. MCNEILE
JOSEPH JARAMILLO

8

DANIEL ALPER
Attorneys for Plaintiff Shirley Neer

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28